EXHIBIT B

Exhibit B - Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

AMERY GASPARD, YVONNE HRINDICH,      )
                                     )
                    Plaintiffs,      )
                                     )
vs.                                  )  No. 5:15-cv-01802-VBF-KES
                                     )
DEA TASK FORCE, a joint powers       )
police force, CHUCK ROSENBURG, as    )
Acting Administrator, et al.,        )
                                     )
                    Defendants.      )
_____)

          DEPOSITION OF YVONNE HRINDICH, a plaintiff

          herein, noticed by Best, Best & Krieger LLP,

          taken at 2855 East Guasti Road, Suite 400,

          Ontario, California at 10:00 a.m., Wednesday,

          February 12, 2020, before Deborah Deveny,

          CSR 7990, RPR, RMR.

          Job No.: 605925

**Exhibit B - Page 2**

YVONNE HRINDICH - 02/12/2020

Page 2

APPEARANCES OF COUNSEL:

For Defendants City of San Bernardino, et al.:

BEST BEST & KRIEGER LLP

BY DAMIAN A. NORTHCUTT

2855 East Guasti Road, Suite 400

Ontario, California   91761

For Defendant County of San Bernardino:

SAN BERNARDINO COUNTY COUNSEL

BY LAURA L. CRANE

385 North Arrowhead Avenue, Fourth Floor

San Bernardino, California   92415

**Exhibit B - Page 3**

YVONNE HRINDICH - 02/12/2020

Page 5

Q.   Do you have an e-mail address?

A.   Yes.  It's yvonnehrindich@yahoo.com.

Q.   Have you ever had your deposition taken before?

A.   No.

Q.   So this is the very first time?

A.   Uh-huh.

Q.   Let's go through a couple ground rules and I will try to explain the process to you and make it as simple as possible.

A.   Okay.

Q.   We are here in a conference room.  And even though it's an informal setting, you've been given an oath, it's the same oath that you would give in a court of law.

A.   Yes.

Q.   So you're under penalty of perjury to give the best testimony that you can and to be truthful.  Do you understand that?

A.   Uh-huh.

Q.   One thing that we do in normal conversations is we talk over each other or we say things like uh-huh or huh-uh. We have a court reporter here who's transcribing everything that we're --

A.   And she can't transcribe uh-huh and --

Q.   Right.  So we need --

A.   Yes and no.

**Exhibit B - Page 4**

YVONNE HRINDICH - 02/12/2020

Page 6

Q.   And the other thing is because in normal conversations we talk over each other, it is difficult for her --

A.   Okay.

Q.   This is the point I'm trying to make.

A.   Yes.

Q.   We need to give each other time to answer each other's questions and make each other's statements; is that okay?

A.   Yes.

Q.   So I will do the same for you and you do the same for me.

A.   Okay.

Q.   Understood?

A.   Yes.

Q.   Today we are trying to get your best testimony. Is there any reason that you think you cannot provide that to us?

A.   No.

Q.   Have you taken any medication or anything that might influence your testimony today?

A.   No.

Q.   Okay. When the deposition is concluded, at a later point you will get a booklet, the actual testimony that's been transcribed. You will have a chance to go ahead and review that and sign off on it at a later point. You also have the

**Exhibit B - Page 5**

YVONNE HRINDICH - 02/12/2020

Page 7

ability to make changes to it if you wish.  But I must caution you if you make big changes, say a yes to a no or something like that, then we might be able to comment on it at trial and say, you know, she obviously wanted to change her testimony, we can use it for impeachment purposes.  So we want your best testimony today.

A.    Okay.

Q.    If for any reason you need to take a break or want to use the restroom, let us know and we can do that as well.

A.    Okay.

Q.    What is your relationship with Amery -- I guess he goes by Joe Gaspard?

A.    Yes.  I'm his caretaker.

Q.    Is there any other relationship that you have with him?

A.    Fiancee.

Q.    And how long have you been engaged?

A.    We have been engaged for three years.

Q.    Did you date before that?

A.    Uh-huh.

Q.    For how long?

MS. CRANE:  Was that a yes?

A.    Yes.  We started dating in '09.

Q.    Do you currently reside at the same address as he does?

Exhibit B - Page 6

YVONNE HRINDICH - 02/12/2020

Page 40

Q.    And neither you nor Joe has paid him any compensation for his work on this case?

A.    No.  He just, like I said, we had to pay for the copies and stuff that he did and stuff like that.

Q.    Can you estimate how long the entire October arrest took?

A.    The arrest?

Q.    From the point of the officers coming into the house to the point of you leaving in the squad car.

A.    I would say about an hour, hour and a half.

Q.    Now after the officers came into your house, you said that the door had been knocked off the hinges.  And you testified later on that I believe James Miller never did anything to secure the property?

A.    He didn't go to work that night.  I guess the next day or something he had somebody come over and try to fix it.

Q.    Do you know if it was ever fixed?

A.    No.  I don't know.

Q.    When you did get out of prison, at that point had the property already been taken from you?

A.    Yes.

Q.    So you weren't actually -- were you actually able to see what property was there or not?

A.    No.

Q.    So do you know what property may or may not have

**Exhibit B - Page 7**

YVONNE HRINDICH - 02/12/2020

Page 41

been stolen?

A.    No.  When I got out, I went to Calimesa to the place I live now.

Q.    So do you know if any property was actually stolen?

A.    Yeah.  I had nothing when I came home.  My laptop was gone.

Q.    Let me back up.  You said when you came home you didn't actually go to --

A.    No.  I never went back to the Newberry home.  I went to Calimesa.  And when I got home, the stuff that he had of mine wasn't what I had when I went to jail.

Q.    And what do you think was missing from that if you can recall?

A.    My laptop, my clothes, my TV.

Q.    Those weren't there when you got out of prison?

A.    No.

MR. NORTHCUTT:  I think that's all I've got for now.

MS. CRANE:  How about we go off the record?  I only have a couple like 10 minutes.

MR. NORTHCUTT:  We can go off the record.

(A brief recess was taken.)

BY MS. CRANE:

Q.    So we are back on the record.  My name is Laura Crane.  I am an attorney for the County of San Bernardino.  So

**Exhibit B - Page 8**

YVONNE HRINDICH - 02/12/2020

Page 42

that includes the sheriff's department and the jail.  Do you understand that?

A.    Yes.

Q.    You don't have a lawsuit against the county anymore.  Do you know that?

A.    Yes.

Q.    And so I'm just going to ask you about Joe Gaspard's lawsuit against the county, okay?

A.    Okay.

Q.    Let's start off with like you said, you were Mr. Gaspard's caretaker before the October arrest?

A.    Yes.

Q.    And what did that entail?

A.    Taking him to the doctors, cooking, cleaning, bathing him if I needed to, making sure he takes his medications.

Q.    You said bathing him if you needed to.

A.    Like sponge bathing and stuff like that.

Q.    But sometimes he could bathe himself?

A.    Yes.

Q.    Most of the time could he bathe himself?

A.    Yes.

Q.    And did he take a shower or a bath?

A.    Yes.

Q.    Did you have any like special lifts or anything in

**Exhibit B - Page 9**

YVONNE HRINDICH - 02/12/2020

Page 43

your bathroom?

A.   No.

Q.   And sometimes he would use a walker but sometimes a wheelchair; is that right?

A.   Yes.

Q.   And what would change that?

A.   Some days his legs just wouldn't work.  He had a lot of spasms in his back and stuff like that and his legs would just give out on him.

Q.   He strikes me as a very manly kind of man; is that right?

A.   Yes.  He doesn't want to give up.  He refuses to stop because he says if he just gives up and stops fighting to walk, he will just give up.

Q.   And so sometimes is he more reluctant to tell people he needs help?

A.   Yes.

Q.   Do you know who took care or helped Mr. Gaspard after he got out of jail while you were still in prison?

A.   His daughter.

Q.   Who is that?

A.   Tammy Gaspard.

Q.   Do you know where she lives?

A.   She lives on Avenue L right around the corner from her dad.

**Exhibit B - Page 10**

Page 44

Q. In Yucaipa?

A. Yes.

Q. Do you know her phone number?

A. No.

Q. And what's her first and last name?

A. Tammy Gaspard.

Q. Do you know what she was doing to help take care of him?

A. No.

Q. And then once you got out of prison, did you resume taking care of Joe Gaspard?

A. Yes.

Q. And did it change at all in what you needed to do?

A. It's gotten a lot worse lately.

Q. He said he's better.

A. No.  He tries to make everybody think he's better. I'm there with him every day.  I deal with it.

Q. Did he tell you about what he says happened in the jail?

A. Yes.

Q. What did he tell you?

A. That he fell in the shower and that the gentlemen that were with him hollered for the police officer but they were busy with somebody else.  So the gentleman helped him out of the shower.  And that's about as far as he went with that.

YVONNE HRINDICH - 02/12/2020

Page 47

STATE OF CALIFORNIA  )  ss

     I, Deborah Deveny, CSR 7990, RPR, RMR, do hereby declare:

     That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 2093(b) and 2094 of the Code of Civil Procedure;

     That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

     I further declare that I have no interest in the event of the action.

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

     WITNESS my hand this 19th day of February, 2020.

_Deborah Deveny_

Deborah Deveny, CSR 7990, RPR, RMR

**Exhibit B - Page 12**